Robert B. CAMPBELL, Jr., Plaintiff,

·v.

FEDERAL EXPRESS CORPORATION,
Defendant.

United States District Court,
D. Maryland.

March 18, 1996.

William F. Gately, Una M. Perez and Howell, Gately, Whitney & Carter, Towson, Md., for plaintiff.

Eric Hemmendinger, Alisa Reff and Shawe & Rosenthal, Baltimore, Md.; Terrill E. Pierce, Maritoni D. Kane and Kaplan & Begy, Chicago, Ill.; and Colby S. Morgan, Memphis, Tenn., for defendant.

DAVIS, District Judge.

## I. INTRODUCTION

After plaintiff, Robert B. Campbell ("Campbell"), failed to gain the necessary certification that he was physically qualified under controlling federal standards for employment as an operator of a commercial motor vehicle, he instituted this lawsuit against his prospective employer, defendant Federal Express Corporation ("Federal Express"), alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101 *et seq.* Pending before the Court is Federal Ex-

press's motion for summary judgment. After a thorough review of the parties' memoranda and evidentiary exhibits, the Court deems no hearing necessary. Local Rule 105.6 (D.Md.1995). The motion for summary judgment shall be granted because Campbell: (1) has failed to exhaust administrative remedies available to him under the federal statute establishing the physical certification requirements; (2) has therefore failed to demonstrate that he was "qualified" under the ADA; and (3) has failed to demonstrate, in any event, that he is "disabled" under the ADA.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. This burden "is particularly strong when that nonmoving party [also] bears the burden of proof." *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990). The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy*, 929 F.2d at 1012. Furthermore, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). In the instant case, a careful review of the record establishes that there is no *genuine* dispute of *material* fact as to several dispositive issues, and that Federal Express is entitled to judgment as a matter of law.

## III. UNDISPUTED FACTS

In April 1986, Campbell, employed as a siding mechanic in the construction industry, was involved in a serious accident, when a co-worker pushed the ladder he was holding into a high tension electrical wire. He suffered major bodily injuries, including an injury to his left hand and fingers. As a result, for three years, Campbell was unable to work and he underwent extensive reconstructive surgery and rehabilitation.

In 1989, after twenty-five surgeries, five of which were on his left hand, Campbell returned to the workforce. From 1989 to 1992, Campbell worked in various capacities, including jobs as a bartender, a heavy equipment operator, a cashier, a dump truck driver, a laborer, and a construction worker. Because the condition of Campbell's left hand

had not changed substantially since the 1986 accident, in fall 1992, he decided to undergo a reconstructive surgical procedure called the "Hunter Rod" surgery.[1] If administered successfully, the Hunter Rod surgery would add flexion in Campbell's fingers.

The first two stages of the Hunter Rod surgery did not change the condition of Campbell's left hand or fingers. Before undergoing the third and final stage of surgery, Campbell attempted to return to his construction job; however, he was informed that he had been laid off because there was not enough work available. Campbell then began searching for other employment. He targeted various courier companies, for example, United Parcel Service, DHL/Worldwide Express ("DHL"), and Federal Express. In due course, Campbell was hired by DHL as a part-time motor courier after he passed DHL's administration of the mandatory Department of Transportation ("DOT") physical examination for drivers of commercial motor vehicles.[2]

During Campbell's first month at DHL, he received a letter from Federal Express inviting him to pursue employment with Federal Express. Thereafter, Campbell completed an employment application and passed the DOT written examination. Three weeks later, Campbell had an interview at Federal Express, during which he discussed his medical history and his physical condition. Specifically, Campbell told the interviewer that, if he were hired, he would expect to be absent from work, on occasion, in order to undergo future surgery and rehabilitation. Notwithstanding these disclosures, Federal Express conditionally offered Campbell a position as a permanent part-time courier.[3] In accordance with Federal Express's normal practice, the offer was expressly conditioned on Campbell's passing a drug test and the DOT-required physical examination.

When Campbell reported to Federal Express for his DOT physical examination, he underwent a fifteen minute examination by Laura Davis ("Davis"), a nurse clinician with Options & Choices, Inc. ("Options & Choices"), a medical clinic which performed such exams and other health-related procedures for Federal Express on a fee-for-service basis. Davis had worked for Options & Choices for two years and she had performed thousands of DOT physical examinations. During the examination, *inter alia*, Campbell "picked up a milk crate weighing 75 lbs., even though he could not bend the fingers of this left hand fully...."

---

1. The record contains the following explanation of the Hunter Rod surgical procedure:

 [T]he procedure ... [is administered] in three stages. The first stage involve[s] assessing the condition of the tendons which control [] [plaintiff's] ability to flex his left hand—assessing whether the tendons [are] still attached to muscle. If the doctors [find] that the tendons [are] not attached, the areas where the tendons usually lie [are] cleared out. Thereafter, Hunter Rods (small plastic tubes) [are] implanted in the cleared out areas. The second stage involve[s] simply waiting for scar tissue to form a tunnel around the rods. Finally, the third stage involve[s] lacing tendons which [are] removed from another part of the body through the new tunnel.

 Def.'s Mem.Supp.Mot.Summ.J., at 3 (citing Campbell's Dep. at 86–92).

2. The Department of Transportation, through its Bureau of Motor Carrier Safety, Federal Highway Administration, has promulgated regulations which "establish minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers" and "minimum duties of motor carriers with respect to the qualifications of their drivers." 49 C.F.R. § 391.1 *et seq.* Under the regulations, a physician must certify "[i]n the interest of public safety" that the driver does not have any physical, mental, or organic defect of such a nature as to affect the driver's ability to operate safely a commercial motor vehicle." *Id.* at § 391.43. *See infra* pp. 11–12.

3. Apparently, Campbell was willing to trade a part-time position with DHL for a similar part-time position with Federal Express because the latter offered more favorable fringe benefits.

 The crux of this case seems to be that, regrettably, Campbell, who had been certified by DHL medical professionals, resigned his position at DHL (perhaps with Federal Express's knowledge) before he was made a formal unconditional offer of a job by Federal Express. When Federal Express's medical professionals declined to certify Campbell, he was not able to return to DHL, because he had told DHL (prematurely) that he was resigning to go to work for its competitor, Federal Express. In one of several sad ironies here, it seems that Campbell told Federal Express about his DHL job in order to bolster his standing with Federal Express.

Davis also examined Campbell's ability to "power grasp," as required by DOT regulations. The purpose of the "power grasp" test is to determine "whether sufficient grasp is present to enable the driver to secure and maintain a grip on the steering wheel." 49 C.F.R. § 391.43 ("Instructions for Performing and Recording Physical Examinations"). Davis tested Campbell's ability to "power grasp" by holding out two fingers and having Campbell grasp them. Davis observed that Campbell was unable to "grasp," but could only "pinch" her fingers. Davis testified on deposition that, in her opinion, she did not believe Campbell's "pinch" was sufficient to maintain control over a steering wheel.[4] After the physical examination, Davis noted her observations in her report, and forwarded the report to John O'Connell, M.D. ("O'Connell"), the Medical Review Officer of Options & Choices, for a final determination of Campbell's physical qualifications.[5]

Based on Davis's observations and the physical examination report, O'Connell determined that Campbell was not DOT-certifiable and submitted a final written assessment to Federal Express, where it was reviewed by the appropriate committee. Within a week, Opal Shields ("Shields"), the hiring manager of Federal Express, informed Campbell by letter that he was unqualified for the courier position because of his physical condition, i.e., his deficient performance on the "power grasp" test. Shields invited Campbell "to contact her if he felt Federal Express did not fully consider his qualifications or entertain requests for reasonable accommodation." Campbell tried "countless times" to contact Shields, but she never responded to his calls.

An exchange of correspondence between counsel failed to resolve matters between the parties and in September 1993, Campbell filed a charge of discrimination with the Maryland Commission on Human Relations and the Equal Employment Opportunity Commission against Federal Express, alleging disability discrimination.[6]

## IV. ANALYSIS

 The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees." 42 U.S.C.A. § 12112(a). In order to establish a violation of the ADA, Campbell must prove: (1) that he had a disability; (2) that he was qualified for the courier position; and (3) that Federal Express rejected him due to discrimination solely on the basis of his disability. *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir.1995); *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 212 (4th Cir.1991). The burden of proof as to each of these elements rests on Campbell. Based on the undisputed facts here, Campbell cannot survive summary judgment as to the first two of these essential elements.

4. Campbell alleges that during his physical examination he told Davis about his hand injury and asked her "if it would be a problem." Davis allegedly responded that "she [did not] think so because of the new ADA." Davis also allegedly said that "if it was a problem at all, [Campbell] might have to go in front of a medical board in Memphis." Davis denies that she made these statements.

This dispute does not amount to a dispute of material fact because even if Davis made the statements attributed to her, and even if Federal Express is somehow bound by those statements, *see infra* n. 7, such evidence would only have a bearing on a breach of contract or similar type of claim. This case, of course, presents a federal statutory claim for intentional discrimination; nothing Davis is alleged by Campbell to have said supports the establishment of a prima facie case of intentional disability discrimination. To the contrary, the very indication that the condition of Campbell's hand **could be** "a problem" necessarily communicated to Campbell that Davis's assessment of his condition would not be the final word on the issue, even if she intentionally or inadvertently created that impression otherwise.

5. Campbell questions Davis's competence to perform DOT physical examinations. *See* Pl.'s Mem.Opp'n Mot.Summ.J., at 7–8. He also argues that Federal Express should be criticized for permitting a nurse practitioner, rather than a medical doctor, to conduct the DOT tests. Whatever validity these observations may have in another forum, they do not aid Campbell here.

6. Two months later, in November 1993, Campbell completed the third stage of the Hunter Rod surgery. The results were apparently successful and Campbell gained some flexion in his left hand which he did not have before.

It is undisputed that Federal Express may rely on DOT regulations as a defense to an ADA discrimination claim. The regulations implementing the ADA provide:

> If the alleged discriminatory action was taken in compliance with another Federal law or regulation, the employer may offer its obligation to comply with the conflicting standard as a defense. The employer's defense of a conflicting Federal requirement or regulation may be rebutted by a showing of pretext, or by showing that the Federal standard did not require the [alleged] discriminatory action, or that there was a nonexclusionary means to comply with the standard that would not conflict with [the ADA].

29 C.F.R.App. § 1630.15(e). Moreover, the legislative history of the ADA includes the following admonishment from Congress:

> With respect to covered entities subject to rules promulgated by the Department of Transportation regarding physical qualifications for drivers of certain classifications of motor vehicles, it is the Committee's intent that a person with a disability applying for or currently holding a job subject to these standards must be able to satisfy any physical qualification standard that is job related and consistent with business necessity in order to be considered a qualified individual with a disability under Title I of this legislation.

H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess, 57 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 339. Thus, it is plain that in the absence of a showing of pretext, and provided the DOT certification is "job related" and consistent with "business necessity," Campbell's failure to obtain the required DOT certification is a complete defense to his claim.

In this case, Campbell has not earnestly attempted to show that Federal Express's actions were pretextual; rather, Campbell has argued that Federal Express has **misapplied** the DOT regulations, *i.e.*, that a **correct** application of "the Federal standard did not require" the recision of the conditional job offer.[7]

In response, Federal Express contends that Campbell is precluded from challenging, for the first time within the context of this ADA claim, O'Connell's determination that Campbell's diminished ability to "power grasp" failed to satisfy DOT qualification standards. In other words, Federal Express argues that Campbell should be required to exhaust the remedies provided under DOT's regulatory scheme, and furthermore, that the doctrine of primary jurisdiction should be invoked by this Court, and this Court should accordingly defer to the expertise of DOT to determine Campbell's qualifications under DOT regulations. The Court is persuaded by the logic of Federal Express's contentions on this issue of first impression.

Congress has given the Secretary of Transportation the power to prescribe the qualifications of drivers for motor carriers. 49 U.S.C.A. § 31102(b)(1). Accordingly, DOT, through its Bureau of Motor Carrier Safety, Federal Highway Administration, has promulgated the "Federal Motor Carrier Safety Regulations," which "establish minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carrier" and "minimum duties of motor carriers with respect to the qualifications of their drivers." 49 C.F.R. § 391.1. Under the regulations, a physician must certify "[i]n the interest of public safety" that the driver does not have any physical, mental, or organic defect of such a nature as to affect the "driver's ability to operate safely a commercial motor vehicle." *Id.* at § 391.43. As to the physical qualifications for a driver, section 391.41 of the regulations provides in pertinent part:

---

**7.** Underlying Campbell's contention is the assertion that Federal Express is responsible for the determinations of health professionals employed by Options & Choices. The relationship between Federal Express and Options & Choices is seriously disputed. Federal Express maintains that Options & Choices is an "independent contractor" performing DOT physical examinations. Campbell contends that Options & Choices is an "agent" of Federal Express because (1) Federal Express is the only client for which Options & Choices performs DOT examinations, and (2) in past litigation, its employees were represented by Federal Express's counsel. The Court need not resolve this dispute.

(b) A person is physically qualified to drive a commercial motor vehicle if that person—

(2) has no impairment of:

(i) A hand or finger which interferes with prehension or power grasping; or

(ii) An arm, foot or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or has been granted a waiver pursuant to § 391.49.

*Id.*

The DOT regulations also provide appeal procedures for situations, as in the present case, in which a driver is determined to be unqualified under DOT physical qualification standards. A letter of application for a "waiver of certain physical defects" may be submitted unilaterally by the driver, or jointly by the driver and the motor carrier that will employ the driver if the application is granted. *Id.* at § 391.49. In a case where there are conflicting medical evaluations, such as the conflict Campbell faced between the DHL and Federal Express examination outcomes, the driver may submit an application for resolution of the conflict to the Director of the Office of Motor Carrier Research and Standards. *Id.* at § 391.47. Within sixty days of the Director's determination, the driver or motor carrier may appeal the decision to the Associate Administrator. *See id.* at Part 386. Thereafter, judicial review is available. *Clark v. Skinner,* 937 F.2d 123 (4th Cir.1991); *Carpenter v. Department of Transp.,* 13 F.3d 313 (9th Cir.1994). To a high degree of probability, an appeal to DOT under the above regulatory regime would have afforded Campbell prompt and effective relief.

Nevertheless, Campbell contends that the availability of these administrative remedies is irrelevant. Specifically, Campbell claims that he did not apply for a waiver because the waiver provision applies only when a driver is not qualified to drive. From Campbell's perspective, "he was, has been and continues to be physically qualified." Pl.'s

Mem.Opp'n Mot.Summ.J., at 18. Moreover, Campbell maintains that, precisely because a physician for DHL found him to be qualified under the DOT physical qualification standards, he was "presumptively qualified" under DOT regulations. These arguments beg the question, and worse, they seek, inappropriately, to undermine Federal Express's interest in administering its own certification procedures. As a matter of law, Federal Express was not bound to accede to determinations made by medical professionals retained by its *competitors;* Federal Express was entitled to rely on the determinations made by *its* medical professionals. It is exactly because reasonable medical judgments as to such subjective assessments, made in good faith, may reasonably differ, that an extra-statutory exhaustion requirement is justified here.

Campbell also argues that he was not compelled to exhaust DOT administrative remedies because he exhausted the only relevant ADA-prescribed administrative remedies by timely filing a charge of discrimination with the Maryland Human Relations Commissions and the EEOC. Campbell asserts that there is no "decisional or statutory requirement that imposes ... the duty to seek determination of his qualifications or a waiver before being entitled to relief under the ADA." Pl.'s Mem Opp'n Mot.Summ.J., at 16. Admittedly, Campbell has exhausted the administrative remedies that are explicitly required under the ADA. However, considering the uniqueness of the situation presented here, the Court would be ill-advised to excuse Campbell's failure to exhaust DOT procedures that could have provided him complete relief. *Cf. Hope v. Cortines,* 872 F.Supp. 14, 21 (E.D.N.Y.), *aff'd,* 69 F.3d 687 (2d Cir.1995) (exhaustion requirement of the Individuals with Disabilities Education Act ("IDEA") applies where relief sought under Title II of the ADA was available under IDEA).

Exhaustion of DOT procedures should be required in the instant case because a critical element of Campbell's case, namely whether Campbell met DOT qualifications for the courier position, falls squarely within the regulatory scheme (and substantive expertise) of DOT. The "long settled rule of judicial ad-

ministration [is] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). *See Mulberry Hills Dev. Corp. v. United States*, 772 F.Supp. 1553, 1559–61 (D.Md. 1991). This rule is particularly applicable where a federal agency can resolve specific contested issues and thus obviate the need for judicial review. As the Fourth Circuit stated in *Thetford Properties IV Ltd. Partnership v. United States Dept. of Hous. and Urban Dev.*, 907 F.2d 445, 448 (4th Cir.1990) (citing *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969)):

> The exhaustion requirement serves many purposes, not the least of which are to allow an agency the opportunity to use its discretion and expertise to resolve a dispute without premature judicial intervention and to allow the courts to have benefit of an agency's talent through a fully developed administrative record.

Here, the Court finds these prudential considerations, in the absence of any overarching countervailing factors, persuasive. Campbell has failed to present any evidence to justify his failure to exhaust DOT procedures. *See Darby v. Kemp*, 957 F.2d 145, 147 (4th Cir.1992) (futility and inadequacy of administrative remedies are "exceptions" to the exhaustion requirement).

■ The doctrine of primary jurisdiction also persuades this Court that in cases such as the instant case, DOT should have an opportunity to decide whether the applicable DOT regulations were correctly interpreted and applied. A federal court may properly "refrain from exercising its judicial power so that an agency particularly equipped to address issues and charged with regulatory duties within its expertise may perform its functions." *Mulberry Hills Dev. Corp.*, 772 F.Supp. at 1561. In *United States v. Western Pac. R.R.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1959), the Supreme Court explained:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.... 'Primary jurisdiction' ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed with the special competence of an administrative body.

*Id.* at 63–64, 77 S.Ct. at 165.

The unique circumstances presented here militate strongly in favor of the doctrine of primary jurisdiction. It is not reasonable to conclude that Congress could have intended that juries would serve as the ultimate arbiters of the meaning and application of DOT regulations, but this is exactly the result that will obtain if Campbell is permitted to litigate in the first instance the propriety of Federal Express's reliance on O'Connell's recommendations. Federal Express (and similarly situated motor carriers) would be left to grave uncertainties as to how to conduct their business.

■ Nor is there a scintilla of evidence in the record that Federal Express relied on medical recommendations as a pretext to hide its discriminatory intent, or otherwise acted in bad faith. Rather, the opposite seems affirmatively established: even after Campbell explained his medical history and his prognosis for additional surgery and rehabilitation, and the need to miss work for those reasons, Federal Express proceeded with the pre-employment process, and indeed conditionally offered him employment.

Campbell seems to argue that the later impasse between the parties, after counsel had exchanged correspondence, is evidence that Federal Express behaved badly. The Court agrees that Federal Express treated Campbell less than sympathetically, to say the least. But this observation does not remotely suggest that Campbell has established a prima facie case of disability discrimination; it is only an expression of the view that Federal Express would have acquitted itself well had it demonstrated greater concern for Campbell's circumstances. As distasteful as it is, bureaucratic callousness does not equate to intentional discrimination. Accordingly, Campbell may not call into ques-

tion under the ADA whether DOT standards were properly followed without first exhausting available DOT procedures that could have provided him prompt and complete relief.

Hence, for the purposes of this case, as a matter of law, Campbell was unable to "power grasp" as required by DOT regulations, and therefore he failed to meet all the requirements necessary to obtain DOT certification. As explained below, the consequence of this conclusion is that, as a matter of law, Campbell was "unqualified" for the courier position under the ADA.

■ Under the ADA, a "qualified" person is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C.A. § 12111(8). To make that determination, the Court conducts a two-part inquiry: (1) whether Campbell can perform the essential functions of the job in question, and (2) if not, whether reasonable accommodations made by his employer would enable him to perform those functions.[8] See School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); Myers v. Hose, 50 F.3d 278, 281–82 (4th Cir.1995).

The regulations implementing the ADA define "essential functions" as "those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." 29 C.F.R.App. § 1630.2(n). Essential functions are "fundamental job duties," not "marginal functions" of an employment position. 29 C.F.R. § 1630.2(n). In the instant case, Campbell's loss of mobility and strength in his left hand and fingers prevented him from "power-grasping." It is undisputed that Campbell was only able to "pinch." The DOT regulations discussed above plainly prohibit drivers who are unable to "power grasp" from driving a commercial motor vehicle on behalf of a motor carrier. Thus, Campbell's inability to "power grasp" the steering wheel of a motor vehicle, as a matter of law, renders him unqualified to perform the essential functions of a Federal Express courier. See 29 C.F.R. § 1630.15(e); Myers, 50 F.3d at 282.[9] See also Chandler v. City of Dallas, 2 F.3d 1385, 1394 (5th Cir. 1993), cert. denied, —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) (based on DOT regulations bus drivers with insulin-dependent diabetes cannot perform the essential functions of their jobs). Accordingly, Campbell's ADA claim fails and summary judgment shall be entered in favor of Federal Express.[10]

## V. CONCLUSION

This is a sad case. A young man victimized through no apparent fault of his own has

8. Campbell has declined to suggest to the Court any means by which Federal Express could have reasonably accommodated him. Instead, he has consistently maintained that he "can perform the essential functions of the [courier] position without a reasonable accommodation." Def.'s Mem. Opp'n Pl.'s Mot.Summ.J., at 30. Therefore, Campbell's right to reasonable accommodation is waived.

9. Judge Wilkinson explicitly interpreted the "essential functions" requirement for the Myers Court to include the requirement that a motor vehicle operator satisfy safety standards as a part of the "essential functions" of the position. See Myers, 50 F.3d at 282 ("The basic function of a bus driver is to operate his motor vehicle in a timely, and responsible fashion ... [and] that [he] perform these duties in a way that does not threaten the safety of his passengers or of other motorists.") (citation omitted). Thus, even apart from the special solicitude extended employers in respect to a job the performance of which involves a heightened risk of harm to others, Doe v. University of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir.1995), basic DOT safety standards

indisputably have application here. See 29 C.F.R.App. § 1630.1(b) and (c) ("The ADA does not automatically preempt medical standards or safety requirements established by Federal law or regulations.").

10. The Court also agrees with Federal Express that Campbell has not shown that he is "disabled" within the meaning of the ADA, because the undisputed facts show that at the relevant time his physical limitations did not "substantially limit one or more of [his] major life activities" as must be established under 42 U.S.C. § 12102(2)(A). Williams v. City of Charlotte, 899 F.Supp. 1484, 1487–89 (W.D.N.C.1995) (applying Forrisi v. Bowen, 794 F.2d 931 (4th Cir. 1986)) (internal quotations omitted). As well, for the reasons discussed earlier, Campbell's lack of "power grasp" does not by itself make him eligible to take advantage of the expansive alternative definitions of disability contained in the ADA. See 42 U.S.C.A. § 12102(2)(A)–(C). As a matter of law, Federal Express has neither "relied on a record" of Campbell's medical history, nor did Federal Express "regard" Campbell as "dis-

struggled to overcome the effects of a terrible personal tragedy. Determined to work and thereby to remain a self-sufficient and independent individual, he takes advantage of every opportunity to improve his life. A well-meaning prospective employer, bound by federal standards as to physical capabilities, and acting in what appears without question to be the utmost good faith, refuses to live up to a conditional offer of employment, even after Campbell has unwisely and prematurely relinquished comparable employment in apparent reliance upon what he erroneously believed was a firm offer of employment. Lawyers threaten and posture; positions harden, and litigation results. Mr. Campbell deserved better. For the reasons expressed in this opinion, this Court concludes that, as a matter of law, in rationally harmonizing the interplay of the related statutory schemes at issue in this case, the source of his redress was not under the ADA but instead was with the Department of Transportation, in the first instance. Accordingly, Federal Express's motion for summary judgment shall be granted and Campbell's ADA claim shall be dismissed with prejudice. A separate order shall be entered herewith.

abled"; it regarded him as not certifiable under DOT regulations.